UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Conservation Law Foundation, Inc.,
     Plaintiff

     v.                                    Case No. 13-cv-214-SM
                                           Opinion No. 2014 DNH 235
Plourde Sand and Gravel Co., Inc.,
     Defendant


**O R D E R**


     This is a citizen suit brought by the Conservation Law

Foundation ("CLF").  CLF alleges that Plourde Sand and Gravel

Co., Inc. ("Plourde") violated the Federal Water Pollution

Control Act (the "Clean Water Act," the "Act," or "CWA"), 33

U.S.C. § 1251 et seq., by discharging storm water associated with

its industrial activities, as well as other pollutants, into

waters of the United States.  Specifically, CLF alleges in count

I that Plourde has been discharging pollutants from at least one

point source into the Merrimack River, without authorization

under a valid National Pollution Discharge Elimination System

("NPDES") permit as required by the CWA.  In count II, CLF

alleges that Plourde violated the CWA by failing to obtain either

an individual NPDES permit or coverage under the Multi-Sector

General Permit issued by the Environmental Protection Agency (the

"EPA").  In count III, CLF alleges that Plourde violated the CWA

by failing to comply with its permit requirements.  CLF seeks

declaratory and injunctive relief, as well as civil penalties, costs, and attorney's fees.

Plourde moves to dismiss CLF's complaint pursuant to Rules 12(b)(1) and 12(b)(6)[1] of the Federal Rules of Civil Procedure, arguing that CLF has not alleged sufficient facts to demonstrate that it has constitutional standing to maintain this lawsuit, and it has not complied with the statutory preconditions to filing suit.

Because CLF has pled sufficient facts in its complaint, as supplemented by the declaration of one of its members, to support associational standing to pursue its claims, and has sufficiently complied with the notice provisions described in 33 U.S.C. § 1365(b)(1) and 40 C.F.R. § 135.3(a), the motion to dismiss (document no. 32) is denied.

**Background**

Plourde operates a sand and gravel processing facility in Hooksett, New Hampshire, near the Merrimack River.  CLF is a

---

[1] Although Plourde purports to move to dismiss based on Rule 12(b)(6) in addition to Rule 12(b)(1), because Plourde addresses its motion and supporting papers to its Rule 12(b)(1) (lack of jurisdiction for, in this case, lack of constitutional and statutory standing), this order speaks only to Plourde's standing arguments.

regional non-profit organization with more than 4,000 members, including more than 450 members in New Hampshire, dedicated to protecting the environment, including protecting New Hampshire's waterways from the significant adverse water quality impacts of storm water pollution.

CLF alleges in its complaint that Plourde maintains earth material piles — including sand, gravel, overburden, raw materials, intermediate product, finished product, by-product, and waste product — at its facility. CLF further asserts that Plourde engages in industrial activities, such as storing, moving, and processing materials using heavy machinery and equipment, and that the materials, heavy machinery and equipment, maintenance areas, loading areas, shipping areas, vehicles, and onsite refueling of activities, are all exposed to storm water and snow-melt, and on occasion, equipment and material may be sprayed down with water under certain conditions.

When the industrial materials and equipment located at Plourde's facility are exposed to storm water, says CLF, the water becomes contaminated with dust, suspended solids, dissolved solids, fines, hydrocarbons (oil, grease, and fuel), heavy metals, sediment, road salt, trash, and other pollutants. The polluted water is then discharged, CLF alleges, via various point

3

sources, such as site grading, surface water channels, subsurface hydrological connections, and detention ponds, into two surface-water wetlands complexes located in the northeasterly and southeasterly areas of Plourde's facility.  CLF claims that the south detention pond-wetlands discharges polluted water into the Merrimack River via surface water flows and a culvert, and the north detention pond-wetlands discharges polluted water into the Merrimack River via surface water flows and a man-made conduit.

CLF contends that these activities harm both its organization, whose interest is protection of New England's and New Hampshire's environment and waterways, and its members, who use and enjoy New England's and New Hampshire's waterways, including waters of the United States affected by Plourde's industrial activities, such as the Merrimack River, for recreational and aesthetic purposes, including boating, swimming, fishing, hunting, and sightseeing.

In addition to the allegations in CLF's complaint, CLF also offers a declaration from one of its members, Mark Feigl, of Concord, New Hampshire, who regularly makes use of the approximately four mile stretch of the Merrimack River in the area of Plourde's facility to swim, canoe, and hunt.  Feigl states in his declaration that he is "concerned ab[o]ut the water

4

quality and overall environmental health of the river . . ., the surrounding tributaries, streams, wetlands, and ponds that may flow into the Merrimack River."  He also expressed "concerns" that the river is not safe for his daughter, his dog, or himself, and he limits the quantity of duck harvested from the Merrimack River and ponds near the Plourde facility that he serves friends and family.

CLF claims that Plourde's alleged discharge of pollutants into the detention ponds, wetlands, and eventually the Merrimack River without obtaining a permit violates the CWA.  The CWA prohibits the "discharge of any pollutant" into navigable waters from any "point source" without an NPDES permit.  33 U.S.C. § 1311(a); 40 C.F.R. § 122.2.  "Discharge of a pollutant" includes "surface runoff which is collected or channelled by man."  40 C.F.R. § 122.2.  "Point source" is defined broadly to mean "any discernible, confined, and discreet conveyance, including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discreet fissure, container, rolling stock, concentrated animal feeding operation, landfill leachate collection system, vessel or other floating craft from which pollutants are or may be discharged."  Id.[2]  "Pollutants" include

---

[2] The definition of "point source" expressly excludes "agricultural storm water runoff," but does not exclude "storm water discharge associated with industrial activity."  See

5

"solid waste, incinerator residue, filter backwash, . . . garbage, . . . chemical wastes, . . . wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste discharged into water."  Id.

Additionally, the CWA requires a permit for "a discharge associated with industrial activity."  33 U.S.C. § 1342(p)(2)(B). The EPA regulations implementing this section provide that "[s]torm water discharge associated with industrial activity means the discharge from any conveyance that is used for collecting and conveying storm water and that is directly related to manufacturing, processing or raw materials storage areas at an industrial plant."  40 C.F.R. § 122.26(a), (b)(14).

CLF asserts that Plourde is in violation of the CWA because it is discharging storm water associated with its industrial activities, and other pollutants as described above, without first obtaining (and complying with) an NPDES permit.  Since the CWA was amended in 1987, it has required that facilities engaged in certain industrial activities, such as Plourde's, obtain storm water discharge permits.  33 U.S.C. §§ 1342(a)(1), 1342(p)(2), 1342(p)(3)(A), 1342(p)(4), 1342(p)(6).

--------

§ 122.2.

6

The CWA authorizes a "citizen" defined as "a person or persons having an interest which is or may be adversely affected," to file suit to enforce the CWA's permitting requirements. 33 U.S.C. §§ 1365(a), (g). The statute and its implementing regulations impose a notice requirement on citizen suits requiring a would-be plaintiff to give notice of the alleged violation to the EPA, the State in which the alleged violation occurred, and the alleged violator, at least sixty days before filing a citizen suit. Id. at § 1365(b)(1)(A).

In an effort to comply with the statutory notice requirement, CLF sent Plourde, the EPA Administrator, and the Commissioner of the New Hampshire Department of Environmental Services ("NHDES") a letter on December 3, 2012.[3] Receiving no adequate response from Plourde, and the EPA and NHDES having not filed any enforcement action, CLF filed suit on May 1, 2013.

---

[3] CLF sent a second letter alleging a separate violation of the CWA to Plourde, the EPA, and the NHDES on December 23, 2013. Plourde argues that CLF should not be permitted to rely on that letter to satisfy the statutory notice requirement because it was filed post-suit, and as such, the suit should be dismissed as premature. (Plourde Br. at 16-17.) CLF explained that the second notice consisted of different, additional allegations involving "process wastewater" rather than "storm water discharge associated with industrial activity." CLF has not attempted to rely on its allegations in the second letter to support either constitutional standing or statutory compliance in this suit, nor has CLF sought to amend its complaint to include the additional allegations. Consequently, I have not considered the December 23, 2013 letter.

7

Plourde now moves to dismiss the suit because it claims CLF lacks Article III standing and has not adequately complied with the statutory notice requirements.

**Standard of Review**

In deciding a motion to dismiss for lack of standing under Federal Rule of Civil Procedure 12(b)(1), a court must "accept as true all well-pleaded factual averments in the plaintiff's complaint and indulge all reasonable inferences therefrom in his favor." Katz v. Pershing, LLC, 72 F.3d 64, 70 (1st Cir. 2012) (internal quotation marks omitted). In determining whether a plaintiff has sufficiently alleged its standing to sue, a court may consider affidavits and other such materials outside the pleadings. Gonzalez v. United States, 284 F.3d 281, 287-88 (1st Cir. 2002). "[A] suit will not be dismissed for lack of standing if there are sufficient allegations of fact . . . in the complaint or supporting affidavits." Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Found., Inc., 484 U.S. 49, 65 (1987) (internal quotations omitted).

Allegations of standing, even in the context of a motion to dismiss, must be reasonably definite, factual, and relate either directly or inferentially to each material element necessary to establish standing. See United States v. AVX Corp., 962 F.2d

8

108, 115 (1st. Cir. 1992) (rejecting "conclusory allegations" and "generalized averments" of standing and requiring "reasonably definite factual allegations, either direct or inferential, regarding each material element needed to sustain standing"); see also Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

## Constitutional Standing

<u>Associational Standing</u>

"The ingredients of standing are imprecise and not easily susceptible to concrete definitions or mechanical applications." Dubois v. United States Dep't of Agric., 102 F.3d 1273, 1280 (1st Cir. 1996) (citing Allen v. Wright, 468 U.S. 737, 751 (1984)). To have standing to sue, a plaintiff must have "such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination of difficult . . . questions." Dubois, 102 F.3d at 1280 (quoting Baker v. Carr, 369 U.S. 186, 204 (1962)).

"Standing consists of both a constitutional aspect and a prudential aspect. The constitutional dimension derives from the requirement that federal courts can act only upon a justiciable case or controversy." Dubois, 102 F.3d at 1280-81 (citing U.S. Const. art. III). "If a party lacks Article III standing to

bring a matter before the court, the court lacks subject matter jurisdiction to decide the merits of the underlying case" and must dismiss it.  Dubois, 102 F.3d at 1281 (citing FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 231 (1990)).

To satisfy the constitutional aspect of standing, a "plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought."  Davis v. F.E.C., 554 U.S. 724, 734 (2008) (internal quotations omitted). To carry this burden, the plaintiff must show that "(1) it has suffered an injury in fact that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 180-81 (2000).  As an exception to the general prudential rule that a party must assert its own legal rights and not those of third parties, an "association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right, the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the

relief requested requires the participation of individual members in the lawsuit." Id. at 181.[4]

<u>CLF Sufficiently Alleges Standing at the Motion to Dismiss Stage</u>

Plourde challenges whether CLF has alleged "an injury-in-fact fairly traceable to Plourde" sufficient to establish associational standing. Plourde does not argue that the interests at stake are not germane to CLF's purpose, or that the participation of individual CLF members is necessary to the lawsuit, or that the relief CLF seeks will not redress its alleged harm.

Our court of appeals has recognized that the injury-in-fact component of the constitutional standing analysis "may be satisfied by environmental or aesthetic injuries." <u>Dubois v. United States Dep't of Agric.</u>, 102 F.3d 1273, 1281 (1st Cir. 1996) (citing <u>United States v. Students Challenging Regulatory Agency Procesures (SCRAP)</u>, 412 U.S. 669, 686 (1973); <u>Sierra Club v. Morton</u>, 405 U.S. 727, 734 (1972)). Further, the injury alleged "need not be 'significant'; a 'small' stake in the outcome will suffice if it is 'direct.'" <u>Dubois</u>, 102 F.3d at 1281. The Supreme Court has likewise held "that environmental

---

[4] Plourde does not contest the prudential aspect of standing that a "plaintiff's complaint fall within the zone of interests protected by the law invoked." Id. at 1281.

11

plaintiffs adequately allege injury in fact when they aver that they use the affected area and are 'persons for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." Laidlaw, 528 U.S. at 183 (quoting Sierra Club v. Morton, 405 U.S. 727, 735 (1972); citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 562-63 (1992) ("Of course, the desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing.").

Further, the "relevant showing for purposes of Article III standing . . . is not injury to the environment but injury to the plaintiff." Laidlaw, 528 U.S. at 704. That is because to "insist upon the former rather than the latter as part of the standing inquiry . . . is to raise the standing hurdle higher than the necessary showing for success on the merits in an action alleging noncompliance with an NPDES permit." Id.

In Dubois, an environmental organization and an individual alleged, in relevant part, that the Department of Agriculture failed to require the operator of a ski resort to obtain an NPDES permit, in violation of the CWA, prior to discharging water allegedly containing pollutants into waters of the United States. Dubois, 102 F.3d at 1277. The court of appeals agreed with the

district court's determination that the organizational plaintiff sufficiently alleged standing when it asserted that its members who lived and worked in the vicinity of the ski area would be harmed by the proposed expansion of its activities. Id. at 1281. The organization supported its allegations with affidavits from members who claimed that they lived in the town where the resort was located, used the town's water supply system, which relied in part on a pond at issue as a water source, and made regular recreational use of the area in which the expansion would occur. They also alleged that they would be directly affected by "noise, water quality, taxes, conversion of forested areas, impacts [on] wildlife and a degradation of the visual quality of the town if [the resort] is allowed to expand." Dubois v. United States Dep't of Agric., No. 95-50, 1995 U.S. Dist. LEXIS 16608, at *2 (D.N.H. Nov. 2, 1995).

The court of appeals determined that the individual plaintiff had standing when he alleged that:

> [his] principal residence from 1959-1977 was
> in Lincoln, New Hampshire. [He] has returned
> to the Lincoln area at least once per year —
> and occasionally up to twelve or more times
> per year — since 1977. During these trips,
> [he] has visited relatives and friends,
> collected botanical samples for scientific
> analysis, and engaged in recreational
> activities in and around the [White Mountain
> National Forest] and the Loon Mountain Ski
> Area. Plaintiff's interest in the
> environmental, recreational and aesthetic

13

> quality of the [White Mountain National Forest] are and will be adversely affected by the Defendants' actions challenged in this Complaint.

Dubois, 102 F.3d at 1282.

Similarly, in the Supreme Court's decision in Laidlaw, one association member averred in an affidavit "that he lived a half-mile from [the defendant's] facility; that he occasionally drove over the [river at issue], and that it looked polluted; and that he would like to fish, camp, swim, and picnic in and near the river between 3 and 15 miles downstream from the facility, as he did when he was a teenager, but would not do so because he was concerned that the water was polluted by [the defendant's] discharges." Laidlaw, 528 U.S. at 181.

Arguing, here, that CLF fails to allege an injury-in-fact, Plourde contends that CLF "claims violations" of the CWA "but points to no actual environmental harm." (Def.'s Br. at 1.) But, requiring CLF to show environmental harm in order to establish standing, would "raise the standing hurdle higher than the necessary showing for success on the merits." See Laidlaw, 528 U.S. at 704. CLF need not allege environmental harm to establish standing, only harm to its and its members' interests. See id.

14

Plourde further contends that the allegations of injury in CLF's complaint are too general and specious to satisfy the requirements of Article III standing.  In its complaint, CLF alleges:

> Plaintiff, CLF, is a nonprofit, member-supported organization incorporated under the laws of Massachusetts with an office at 27 North Main Street, Concord, NH 03301 . . . . CLF is a regional organization with more than 4,000 members, including more than 450 members in New Hampshire, and is dedicated to protecting New England's environment.  CLF has a long history of working to protect the health of New England's and New Hampshire's waterways, including addressing the significant water quality impacts of stormwater [sic] pollution.  CLF members use and enjoy New England's and New Hampshire's waterways for recreational and aesthetic purposes, including boating, swimming, fishing, hunting, sightseeing, including but not limited to waters of the United States affected by Plourde Sand and Gravel's activities, including the Merrimack River.  CLF actively seeks federal and state agency implementation of the Clean Water Act and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

> Discharges of pollutants by Defendant adversely affect CLF members' use and enjoyment of water resource, including but not limited to the Merrimack River.  The interests of CLF's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Multi-Sector General Permit.  The relief sought in this action will redress these harms.  The unlawful acts and omissions described herein have irreparably harmed and will continue to irreparably harm Plaintiff's members, for

15

> which harm they have no plain, speedy, or
> adequate remedy at law.

(Compl. at ¶¶ 12-13.)  Standing alone, the allegations fail to identify any CLF member by name, specify that its members use a portion of the Merrimack River within reasonable proximity to Plourde's facility, or state how frequent its members use that particular portion of the Merrimack River, and may fall short of the level of specificity required under Iqbal, Laidlaw, Dubois, and the court of appeals' decision in United States v. AVX Corp., 962 F.2d 108, 116-17 (1st Cir. 1992).

In AVX Corp., the court held that the plaintiff's allegations of injury in fact were insufficient where the organization alleged that its "members have been and will continue to be harmed by the releases" at issue in the case, but no organization members were identified, their places of abode were not provided, and "the extent and frequency of any individual use of the affected resources [was] left open to surmise."  Id.  The allegations in CLF's complaint are similar to the plaintiff's allegations in AVX Corp. held to be insufficient to establish an injury-in-fact.

However, it is not necessary to decide whether the allegations in CLF's complaint, without more, adequately allege

16

an injury-in-fact fairly traceable to Plourde because, unlike the plaintiff in AVX Corp., CLF also submitted the declaration of one of its members, Mark Feigl. In that declaration, Feigl alleges that he has lived in Concord for fourteen years and that he joined CLF prior to its filing this lawsuit. Feigl alleges that "it is [his] hope and intention to continue to use the Merrimack River in this area for many years to come," but that he is "concerned with the water quality of the Merrimack River and its tributaries". He alleges that he has "canoed, swam, duck hunted, performed retrieving drills with [his] dogs Willow and Daisy, and picked up trash with [his] daughters on the section of the Merrimack River between the Merrimack Station coal-fired Electric Generation Plant and the Hooksett Dam" and that due to his activities along the section of the Merrimack River that includes the area adjacent to and just downstream from Plourde, he is "concerned about the water quality and the overall environmental health of the river as well as the surrounding tributaries, streams, wetlands and ponds that may flow into the Merrimack River."

Feigl asserts that he has hunted duck on the Merrimack River for years near Plourde's facility. He says that he has seen ducks on a pond on Plourde's property, but, because he understands that Plourde is discharging storm water associated

with its industrial activities into the Merrimack River, and other waters of the United States, he is concerned that the river is not clean and safe in that area. Consequently, Feigl limits the consumption of ducks harvested from that section of the river near Plourde's facility. Feigl also states that he would enjoy his use of the Merrimack River more if "it was less polluted and if industrial facilities such as Plourde's complied with the Clean Water Act and reduced their pollution."

Like the association members' contentions in Laidlaw and Dubois, and the individual plaintiff's allegations in Dubois, Feigl's allegations sufficiently establish that he, as a CLF member, has suffered actual injury under the law. Consequently, CLF has satisfied the "injury-in-fact" requirement of Article III standing.

Plourde next contends that even if CLF has adequately pleaded an injury-in-fact, that injury is not "fairly traceable" to Plourde. Plourde relies upon CLF v. Public Serv. Co., No. 11-353, 2012 U.S. Dist. LEXIS 13881, at *12-*13 (D.N.H. Sept. 27, 2012) for the proposition that CLF cannot show that the injury alleged by CLF and its member is "fairly traceable" to Plourde because CLF does not allege that Plourde would discharge less

18

polluted water if it had obtained and complied with one of the required permits.  Plourde's analogy misses the mark.

In CLF v. Public Serv. Co., the defendant was not required to have a permit for the regular operation or the preexisting emissions of its power plant.  See id. at *12-13.  Rather, the obligation to obtain a permit arose because the defendants' planned changes and repairs to the plant would allegedly cause an increase in emissions.  Id.  Therefore, in order to show that plaintiff's injuries were "fairly traceable" to the defendant's allegedly illegal activity — increasing its emissions without the required permits — plaintiff in that case needed to allege that its members were exposed to more pollutants than they would have been had the defendant obtained the proper permits — because, otherwise, the plaintiff's members' harm would have resulted from the same pollution the defendant was allowed to emit without a permit.  Id. at *21-*22.

A plaintiff alleging permitting violations under the CWA, however, is not required to demonstrate, or even allege, that the defendant's discharge of pollutants would be any less had it obtained a permit in order to sufficiently allege standing, or even state a claim under the CWA.  See Dubois, 102 F.3d at 1281-83, 1296.  In Dubois, the court recognized that the "most

19

important component of the [CWA] is the requirement that an NPDES permit be obtained" before discharging pollutants from any point source into waters of the United States. Id. at 1294, 1296. That interpretation is confirmed by the Supreme Court and the statutory language itself. See 33 U.S.C. § 1342(p) (requiring a permit for "discharge associated with industrial activity"); Laidlaw, 528 U.S. at 174 (stating "Noncompliance with a permit constitutes a violation of the [CWA]").

In this case, brought under the CWA, CLF alleges that Plourde's discharge of any storm water associated with industrial activity and pollutants is illegal activity because Plourde is required to obtain a permit to discharge any amount. CLF and its member have sufficiently alleged injury as set out above. Since CLF has adequately alleged that Plourde is, without the requisite permit, discharging pollutants from point sources, including site grading, surface water channels, subsurface hydrological connections, and detention ponds, into waters of the United States, and that the unlawful discharges have caused it and its members harm, CLF has also sufficiently alleged, at least at the pleading stage, that its injury is "fairly traceable" to Plourde's allegedly illegal conduct.

Therefore, CLF's allegations that Plourde is discharging storm water and pollutants into waters of the United States, including the Merrimack River, without obtaining and complying with the required permit, and that these illegal discharges harm at least one of its identified members, are sufficient, at this stage, to confer constitutional standing.

## Statutory Standing

In addition to Article III standing, CLF must also have statutory standing to assert a CWA claim. See 33 U.S.C. § 1365(b)(1)(A); Paolino v. JF Realty, LLC, 710 F.3d 31, 33-34 (1st Cir. 2013).[5] Under the CWA, at least sixty days before filing a citizen suit, a would-be plaintiff must provide written notice to the would-be defendant, the EPA Administrator, and the State in which the alleged violation occurred. Id. Our court of appeals has held that the "required contents of pre-suit notice are prescribed in 40 C.F.R. § 135.3, and assessing whether these requirements have been met is a functional, fact-dependent, and case-specific inquiry. Where the information contained in pre-suit notice identifies the potential plaintiffs, provides basic contact information, and allows the putative defendants to

---

[5] The court of appeals declined to hold that the notice requirements of the CWA are strictly jurisdictional. See Paolino, 710 F.3d at 35 n.4. However, the court there held that the notice provisions are "mandatory conditions precedent to the filing of a citizen suit." Id.

21

identify and remedy the alleged violations, we hold that these requirements have been satisfied and that the enforcement action may proceed."  Paolino, 710 F.3d at 34.

"In Gwaltney of Smithfield, Ltd. v. Chesapeake Bay Foundation, Inc., 484 U.S. 49, 59-60 (1987), the Supreme Court explained that the CWA's pre-suit notice requirements serve two purposes, each related to the supplementary role Congress envisioned for citizen enforcement actions.  First, pre-suit notice allows federal and state agencies to initiate their own enforcement action against an alleged violator, obviating the need for a citizen suit."  Paolino, 710 F.3d at 36 (citing Gwaltney of Smithfield, Ltd., 484 U.S. at 59-60; see also 33 U.S.C. § 1365(b)(1)(B) (barring citizen suits where "the Administrator or State has commenced and is diligently prosecuting" its own civil or criminal action)).  "Similarly, the second purpose of notice 'is to give [the alleged violator] an opportunity to bring itself into complete compliance with the Act and thus likewise render unnecessary a citizen suit.'"  Paolino, 710 F.3d at 36-37 (quoting Gwaltney, 484 U.S. at 60; see also Hallstrom v. Tillamook Cnty., 493 U.S. 20, 29 (1989) (relying on Gwaltney in identifying same purposes for parallel notice requirements under the Resource Conservation and Recovery Act)).

22

Congress tasked the EPA to determine what information a pre-suit notice letter must contain to achieve its dual purposes. See Paolino, 710 F.3d at 37 (citing 33 U.S.C. § 1365(b)). "In the CWA's legislative history, Congress clarified that [the EPA's] implementing regulations 'should not require notice that places impossible or unnecessary burdens on citizens but rather should be confined to requiring information necessary to give a clear indication of the citizens' intent.'" Paolino, 710 F.3d at 37 (quoting S. Rep. No. 92-414, at 80 (1971), reprinted in 1972 U.S.C.C.A.N. 3668, 3745). The applicable regulations provide that pre-suit notice must contain "sufficient information to permit the recipient to identify the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation, the date or dates of such violation, and the full name, address, and telephone number of the person giving notice." 40 C.F.R. § 135.3(a).

In this circuit, the "key language in § 135.3(a) is that pre-suit notice must permit 'the recipient' to identify the listed information, i.e., the specific standard at issue, the dates on which violations of that standard are said to have occurred, and the activities and parties responsible for causing

23

those violations." Paolino, 710 F.3d at 37. The necessary inquiry is "whether the notice's contents place the defendant in a position to remedy the violations alleged." Id. (emphasis in original). Further, the court in Paolino explained that the "adequacy of the information contained in pre-suit notice will depend upon, inter alia, the nature of the purported violations, the prior regulatory history of the site, and the actions or inactions of the particular defendants." Id.

In Paolino, the court stated that where, as in this case, "the alleged violations concern the unlawful discharge of pollutants," some courts have required that pre-suit notice letters identify the particular pollutants being discharged. Paolino, 710 F.3d at 37. However, because the standard was so clearly met in that case, the court declined to address whether that holds true in every case alleging the discharge of pollutants. Id.

The court there also provided that "in many cases, there must be sufficient facts asserted about the mechanisms and sources involved in these unlawful discharges so that the defendants may take appropriate remedial action," but recognized that a pre-suit notice letter could be sufficient where it asserted a specific permit that was violated but failed to assert

specific point sources for each alleged discharge.  Paolino, 710 F.3d at 37-38 (citing Friends of the Earth, Inc. v. Gaston Copper Recycling Corp., 629 F.3d 387, 401 (4th Cir. 2011); Atl. States Legal Found., Inc. v. Stroh Die Casting Co., 116 F.3d 814, 819-20 (7th Cir. 1997)).

In Paolino, the pre-suit notice identified sections of the CWA that plaintiffs alleged the defendant violated and stated that the violations consisted of holding a permit in the wrong name and "continually discharging pollutants into United States waters."  Paolino, 710 F.3d at 39.  The plaintiffs alleged that defendant was discharging hazardous storm water runoff via a drainage ditch that flowed through the plaintiffs' property into waters of the United States.  Id.  The plaintiffs further set out a list of dates and water levels that plaintiffs tested on their own property that allegedly exceeded allowable levels.  Id.

While CLF's pre-suit notice in this case is not as specific as the notice provided by the plaintiffs in Paolino, the court of appeals has recognized that the CWA does not require a plaintiff to "list every specific aspect or detail of every alleged violation, or describe every ramification of a violation," Paolino, 710 F.3d at 38.

25

CLF's pre-suit letter was delivered to Plourde, the EPA Administrator, and the Commissioner of the New Hampshire Department of Environmental Services, as required by the regulation. See 33 U.S.C. 1365(a). The letter identified "the specific standard [or] limitation" violated as well as the activity alleged to be in violation," 40 C.F.R. § 135.3(a). The letter asserted that Plourde "is discharging storm water directly associated with the construction sand and gravel site at 591 West River Rd., Hooksett, NH 03106 . . . to the waters of the United States without a permit, in violation of 33 U.S.C. §§ 1311(a) and 1342(p)(2)(B) [and] failed to obtain coverage under any [CWA] permit including the Multi-Sector General Permit adopted by the EPA for industrial sources of polluted storm water runoff, and failed to comply with the specific requirements of any such permit, in violation of 33 U.S.C. §§ 1342(p)(3)(A) and (p)(4)(A), and 40 C.F.R. §§ 122.26(c)(1) and (e)(1)." Letter from Zachary K. Griefen, CLF, to Oscar P. Plourde et al., Plourde Sand and Gravel Co., Inc. (Dec. 3, 2012) ("Dec. 3, 2012 Letter") at 1 (document no. 1-1).

CLF also alleged in its notice letter that the point where Plourde discharged storm water associated with industrial activities into the Merrimack River, and just downstream from that point, is impaired under the CWA "for failure to meet

26

minimum water quality standards," because it is impaired for mercury, aluminum, dissolved oxygen saturation, pathogens, and pH, to which "storm water is a significant contributor." It further asserted that Plourde is discharging pollutants, including dust, total suspended solids, total dissolved solids, diesel and gas fuel, oil, heavy metals, and trash, and "storm water discharge associated with industrial activity," as defined by the CWA and its implementing regulations "through at least the following point sources: the sand and gravel piles that are open to the elements; the machines and equipment left outdoors, and the vehicles driving on and off [Plourde's facility], while additionally conveying pollutants through site grading, surface water channels, subsurface hydrological connections, detention ponds, culverts, and other conveyances to the Merrimack River." Dec. 3, 2012 Letter at 2-4.

The letter went on to inform Plourde of the steps it could take to remedy its violations. Id. at 5-7.

The letter identified Plourde Sand and Gravel Co., Inc., and its officers and directors, including Oscar P. Plourde, as "the person responsible for the alleged violation." It identified the Plourde Sand and Gravel facility "located at 519 West River Rd., Hooksett, NH 03106" as "the location of the alleged violation."

Dec. 3, 2012 Letter at 1-2.  It identified "every day since at least 2007 on which there has been a measurable precipitation event" as "the date of dates of [the] violation."  Id. at 8.  The court of appeals has suggested that such notice of times is compliant.  Paolino, 710 F.3d at 38 (citing Waterkeepers N. Cal. v. AG Indus. Mfg., Inc., 375 F.3d 913, 917-18 (9th Cir. 2004)).  Finally, the letter is signed by and provides "the full name and address of the person giving notice," a CLF attorney.  Id. at 9.

Plourde complains that CLF's pre-suit notice letter contains both too much information and too little detail.  Plourde concedes that CLF's notice letter provides lists of pollutants and point sources that all allegedly conveyed pollutants into the Merrimack River, but charges that the notice is "bereft of any particularized facts" that would allow Plourde to remedy the alleged violations, such as one specific mechanism by which Plourde allegedly discharges pollutants into United States waters.  Plourde cites to a case in which the plaintiff, an individual, sued no less than nine defendants, including the EPA Administrator, the United States Secretary of Commerce, the State of Washington, the City of Olympia, Weyerhaeuser NR Company, the Federal Railroad Administration, and others, accusing them "of a vast conspiracy among the recipients of the letter to violate most of the provisions of the CWA."  West v. Johnson, No. 08-

5741, 2009 U.S. Dist. LEXIS 77128, at *9-*12 (W.D. Wash. Aug. 10, 2009).  There the court held that the notice was too broad to provide the defendants with sufficient notice, in part because it did not permit the multiple defendants to discern what activities each of them engaged in that allegedly constituted a violation. Id. at *11-*12.  Plourde also relies on a Tenth Circuit decision in which the pre-suit notice letter failed to allege any point source from which alleged pollution arising from "construction activities" was discharged.  Karr v. Hefner, 475 F.3d 1192, 1201 (10th Cir. 2007) (finding the plaintiff's pre-suit notice letter insufficient where it alleged that pollution from "construction activities" was being discharged from the defendant's well rather than from any point sources actually associated with its construction activities).

In this case, however, CLF's pre-suit notice letter is both more targeted and specific than the letters in West and Karr. CLF alleges that only one defendant, Plourde, violated specific sections of the CWA by discharging storm water associated with industrial activities and other specified pollutants from no more than eight point sources on Plourde's property.

Courts in this and other circuits do not require "a citizen plaintiff to list every specific aspect or detail of every

29

alleged violation." Paolino, 710 F.3d at 38. Rather, "the [CWA's] notice provisions and their enforcing regulations require no more than 'reasonable specificity'." Id. (citations omitted). CLF's pre-suit letter in this case provided Plourde with sufficient notice that it was and is violating the CWA by discharging pollutants, including storm water discharge associated with industrial activity, from several discrete point sources on its property, without a required permit, and in violation of the same. The notice provided Plourde with sufficient information for it to identify and remedy the alleged violations arising from its failure to obtain the proper permit.

Consequently, CLF satisfied the statutory conditions precedent to maintaining this suit provided in 40 C.F.R. § 135.3(a).


**Conclusion**

For the foregoing reasons, CLF has sufficiently alleged Article III standing and has satisfied the statutory condition precedent to filing a citizen suit in this case. Accordingly, Plourde's motion to dismiss (document no. 32) is denied.

30

**SO ORDERED.**

_____
Steven J. McAuliffe
United States District Judge

November 6, 2014

cc:  Zachary K. Griefen, Esq.
     Thomas F. Irwin, Esq.
     George D. Bisbee, Esq.
     Daniel E. Will, Esq.
     Joshua M. Wyatt, Esq.